UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

EMILY COMISKEY,                         *
                                        *
            Plaintiff,                  *
                                        *
      v.                                *            Civil Action No. 16-cv-11386-IT
                                        *
HANNAFORD BROS., CO.,                   *
                                        *
            Defendant.                  *

MEMORANDUM & ORDER

June 28, 2018

TALWANI, D.J.

Plaintiff Emily Comiskey brings this suit against her former employer, Defendant

Hannaford Brothers, Co. ("Hannaford"). Before the court is Hannaford's <u>Motion for Summary</u>

<u>Judgment</u> [#55]. For the reasons that follow, Hannaford's <u>Motion for Summary Judgment</u> [#55]

is ALLOWED.

      I.      <u>Background</u>

Be      This section recounts evidence relevant to Comiskey's claims that is either undisputed

for purposes of summary judgment, as reflected by the parties' Local Rule 56.1 statements of

material fact and responses, not properly disputed per Federal Rule of Civil Procedure 56(c)

and (e), or viewed in the light most favorable to Comiskey, as the non-movant.

      Hannaford's West Peabody grocery store hired Comiskey as a part-time deli associate in

2005. Def.'s Statement of Mat'l Facts ("Def.'s SOF") ¶ 1 [#56]. The store was structured such

that shift managers worked under the direction of deli managers and assistant deli managers, so

that at any point in time, Comiskey had "five, six bosses." Comiskey Dep. 125:1 [#56-2]. At

the time Comiskey was hired, Patrice Glynn worked as the store's deli manager. Def.'s SOF

¶ 2. According to Comiskey, John Gaudette was one of the assistant deli managers. Id. ¶¶ 2-3. Many of Comiskey's co-workers liked Gaudette. Comiskey Dep. 112:14 [#56-2].

In 2007, Comiskey filed a sexual harassment complaint against Gaudette using Hannaford's internal reporting system. Id. ¶ 4. Hannaford responded by firing Gaudette. Id.

Comiskey started experiencing panic attacks around 2007. Id. ¶ 15. She attributes the attacks, at least in part, to post-traumatic stress disorder ("PTSD"). Id. The attacks occurred two to three times per week and were triggered when Comiskey's co-workers yelled at her, causing her to feel a "claustrophobic" feeling. Comiskey Dep. 66:4-11 [#56-1]. Comiskey contends that her co-workers were unsupportive and stood around ignoring her when she experienced these attacks. Id. at 68:18-22.

Sometime shortly after Comiskey filed the complaint against Gaudette, according to Comiskey, the associate relations manager at the West Peabody store, Ann Baillie, started belittling and demeaning Comiskey in front of other associates. Comiskey Dep. 122:10-20 [#56-2]. This happened "[f]rom after the John Gaudette thing up until the end. Up until my last day there." Id. at 118:14-15. According to Comiskey, Baillie told Comiskey, "if you ever say this to anyone, I will deny it but I just wish you would leave and get another job because I am sick of looking at your face and I am sick of listening to you cry." Pl.'s SOF ¶ 8; Comiskey Dep. 75:1-4 [#56-1]. According to Comiskey, Baillie "was mad because [Comiskey] talked to another human resource person instead of her and she hated me since then because [Baillie] said [she] could have lost [her] job by [Comiskey] going over [her] head." Comiskey Dep. 75:7-10 [#56-1]. Every six months, according to Comiskey, Comiskey asked Baillie for a transfer to another department in the store. Baillie refused each request, according to Comiskey, saying "if you don't like it, just go get another job. Get out of here." Comiskey Dep.

118:8-9 [#56-2].

While she was working in the deli department, Comiskey submitted an application for an opening elsewhere in the store for a janitorial position. Comiskey testified that she believes she submitted the application roughly six months to a year after making the Gaudette complaint, at some time in 2008. Comiskey Dep. 119:24-25 [#56-2]. She did not get the job. Id. at 120:5.

In 2008, Comiskey received performance counseling for creating conflict with other associates. Def.'s SOF ¶ 12. In 2009, she received performance counseling for making negative comments about another associate's productivity. Id. In March 2010, Comiskey received performance counseling regarding a verbal encounter with one of her coworkers, Norman Dellacroce. Id.; Comiskey Dep. 29:7-25 [#56-1]. Dellacroce was friends with Gaudette. Pl.'s SOF ¶ 17. The report of the incident was prepared by Deli Manager Patrice Glynn. Exhibits to Comiskey Dep. 17 [#56-3]. Glynn wrote that she spoke with Comiskey about her inappropriate comments and let her "know any threats or harassment to any associate will lead up to action steps up to and including termination." Id.  Glynn had Comiskey sign a section of Hannaford's Anti-Harassment Policy stating that prohibited harassment includes, "among other things, bullying, humiliating, taunting, disparaging, degrading, provoking or making inappropriate references to others." Id. at 19.

In April 2010, Comiskey received further performance counseling for making threatening and disparaging comments to other employees in the deli department. Def.'s SOF ¶ 12. This performance counseling report further stated that Hannaford would not tolerate harassment and if Comiskey continued to harass co-workers she "will receive further disciplinary action, up to, and including termination." Exhibits to Comiskey Dep. 27 [#56-3].

Glynn and another manager, Kevin Fortier, met with Comiskey about her alleged

harassment of co-workers in April 2010. Comiskey Dep. 39:19-20 [#56-1]. According to Comiskey, Fortier yelled at Comiskey loudly, said he "hates [her] face and everyone in the department hates [her] face and to leave." Id. at 41:3-8. Comiskey testified that Fortier said Comiskey should leave work and would get a call Monday or Tuesday (Fortier said this on Saturday) saying whether she could return to work. Id. According to Comiskey, Hannaford moved Fortier to a different store for talking to her like that. Id. at 41:23.

Around this time, Comiskey was still attempting to transfer to a different department. Comiskey was permitted to cross-train in the bakery department of the West Peabody store for three days, but then was told she would not be able to transfer from the deli to the bakery. Comiskey Dep. 120:9-16 [#56-2]. Comiskey estimates that this failed transfer to the bakery department occurred sometime in the year 2010. Id. at 121:3.

According to Comiskey, in March 2013, Glynn yelled at Comiskey for working too slowly and then grabbed Comiskey's face. Comiskey Dep. 64:18 [#56-1]. Comiskey says that she received marks on her face when Glynn squeezed and shook her. Id. at 64:21-22; Def.'s SOF ¶ 28. Comiskey testified that she does not think Glynn's issue with her was only about Gaudette, but also that Glynn "didn't like [that] the customers liked [Comiskey] better than [Glynn]." Comiskey Dep. 125:13-16 [#56-2]. Hannaford received a complaint about the incident between Comiskey and Glynn, which resulted in Glynn's discipline, demotion, and transfer to another store. Comiskey Dep. 65:8-23 [#56-1]; Def.'s SOF ¶ 28. Following the incident, according to Comiskey, Comiskey was confronted by hostility from her co-workers for getting Glynn "thrown out the door." Comiskey Dep. 77:9-13 [#56-1]. Comiskey testified that in April 2013 her panic attacks increased, yet no one in her department would speak with her. Id. at 79:7, 80:12-14.

Bryan Case replaced Glynn as deli manager in May 2013. Def.'s SOF ¶ 6. Case testified that he was not aware why Glynn stopped working at the store. Case Dep. 30:16-19 [#58]. Case treated Comiskey fairly and was "very respectful" throughout his tenure as deli manager. Def.'s SOF ¶ 11. According to Case, Comiskey would suddenly cry uncontrollably if she perceived someone was doing something to upset or hurt her. Id. ¶ 16. During these attacks, Case permitted Comiskey to go to the store's back room so that Comiskey could calm herself down using breathing techniques. Id. ¶ 17. Comiskey was paid for the time she spent in the back room. Id. ¶ 19. According to Case, Comiskey never told him that she had a disability or requested an accommodation. Case Dep. 236:4-11 [#58-2]. Case said that he nonetheless allowed her to go to the back room to regain her composure because he "thought it was the right thing to do." Id. at 236:12-15.[1] Case testified that he "could tell that there was something in her past that had happened." Case Dep. 174:23-175:4 [#58-1].

In February 2014, one of Comiskey's co-workers came to Case to tell him that Comiskey was telling other co-workers that one co-worker was sexually harassing another. Case Dep. 123:15-19 [#58-1]. Assistant Store Manager Jillian Sierra conducted an investigation, during which she interviewed the purported victim, Sue Beaulieu. Exhibits to Case Dep. 64 [#58-2]. In an email to Baillie and Case, Sierra wrote that "[Beaulieu] stated that there was nothing going on between her and [the purported harasser] and that there was not an issue. [Beaulieu] said that [Comiskey] would not let it go. [Comiskey] was going to call corporate." Id. Case testified that this was the only complaint of harassment raised by Comiskey of which he was aware.

---

[1] While Comiskey maintains that she informed Case of her disability, and requested accommodations including department transfers, see Pl.'s Responses to Def.'s SOF ("Pl.'s SOF Responses") ¶ 18 [#72], she has not cited to any evidence in the record demonstrating this, and thus has not properly supported her factual assertion for purposes of summary judgment.

Case Dep. 172:18-21 [#58-1]; see also Case Dep. 234:17-18 [#58-2].

In February 2014, John Frontiero became the store manager. At the time, he was not informed of the 2013 incident between Comiskey and Glynn. Frontiero Dep. 22:15-21 [#56-7]. In September 2014, Beaulieu complained to Frontiero about Comiskey not doing her job and not being on the counter. Frontiero Dep. 24:17-22, 25:14-15 [#56-7]; see also Frontiero Dep. 9:17 [#56-8]. Frontiero learned then of the 2013 incident between Comiskey and Glynn. Frontiero was never made aware of Comiskey's 2007 harassment complaint against Gaudette. Id. at 23:20-24:6. Frontiero referred Beaulieu's complaints about Comiskey to Case. Id. at 25:1-6. Comiskey, in turn, testified that she went to Frontiero and asked for a meeting about Beaulieu, but Frontiero did not take any corrective action. Comiskey Dep. 89:4-14 [#56-1]. Comiskey does not think Frontiero cared about her panic attacks. Id.

Case left the West Peabody store in May 2015. Def.'s SOF ¶ 6. He was replaced for a short time as deli manager by Samantha Stickney. Id. ¶ 10. According to Comiskey, Stickney was "very nice" to Comiskey. Id. ¶ 11. Comiskey continued to use the method Case developed for dealing with Comiskey's panic attacks, in which a manager permitted Comiskey to go to the store's back room to regain control. Id. ¶ 20.

On July 31, 2015, Beaulieu made a complaint against Comiskey using Hannaford's I-Share internal complaint system. Id. ¶ 29. Beaulieu's complaint reads:

> Emily [Comiskey] is known to have an unstable personality and she makes false claims against coworkers because she does not care for them. Emily had made false allegations against coworkers about Emily allegedly witnessing sexual harassment and she's made other claims as well. Now, Emily is claiming that she is fearful for her life because of Susan [Beaulieu]. Susan states that this is where she draws the line because the association that Susan would do anything to Emily is preposterous. Emily's false allegations are intentionally dishonest and are also a result of her mental concerns. Emily has gotten many employees terminated because of her manipulation.

<u>Id.</u> ¶ 30.

According to Baillie, I-Share complaints went directly to Hannaford's corporate offices, bypassing local store management, so Baillie first heard of Beaulieu's complaint when Beaulieu personally told her about it on August 2, 2015. Def.'s SOF ¶ 32; Baillie Dep. 24:10 [#56-7]. Frontiero convened a meeting on August 3, 2015, to address the working relationship between Comiskey and Beaulieu. Def.'s SOF ¶ 32. Baillie also attended. <u>Id.</u> During the meeting, Comiskey stated that she felt her life was threatened during an incident in which Beaulieu pointed her finger at Comiskey and yelled at her. Frontiero concluded the meeting by noting that Comiskey and Beaulieu were struggling to work together and the deli department needed some new ground rules. <u>Id.</u> Comiskey agreed to work on her communication to make things easier for Beaulieu, but Beaulieu said she did not trust Comiskey and did not think that they could continue to work together. Frontiero Dep. 9:1-19 [#56-9].

Meanwhile, Elizabeth McMillen, a regional associate relations manager who worked out of Hannaford's regional corporate offices, investigated Beaulieu's I-Share complaint. Def.'s SOF ¶ 29; Pl.'s SOF ¶ 4. McMillen's job was to assist human resources in the retail stores with issues involving performance counseling, consultation, and misconduct investigations. Frontiero Dep. 9:12-24 [#56-10]. Prior to receiving the I-Share complaint, McMillen had never met or heard of Comiskey. McMillen Dep. 67:23 [#56-10]. McMillen did not know that Comiskey made a complaint in 2007 that led to Gaudette's termination. <u>Id.</u> at 72:19.

At the outset of McMillen's investigation, Baillie provided McMillen with Comiskey's performance counselling history. Pl.'s SOF ¶ 15. McMillen decided to handle the investigation of the complaint rather than assign it to personnel at the West Peabody store. <u>Id.</u> ¶ 34. McMillen testified that she arrived at this decision after reviewing Comiskey's performance

history and concluding that there was a lengthy prior history of conflict within the West Peabody store. McMillen Dep. 27:1-5 [#56-10].

As part of her investigation into the complaint, McMillen spoke with both Frontiero and Baillie. Def.'s SOF ¶ 36. Baillie suggested to McMillen that Comiskey had made complaints in the past that were inconsistent with the facts. Pl.'s SOF ¶ 15. Baillie did not inform McMillen about Comiskey's 2007 sexual harassment complaint, or Comiskey's 2013 complaint regarding Glynn's assault. Id. ¶ 9. McMillen testified that she felt Baillie was frustrated with Comiskey due to persistent inconsistencies in Comiskey's responses to Baillie during conversations. Id. ¶¶ 7, 13. McMillen also reviewed Comiskey's performance counseling history and noticed a general theme that Comiskey was unable to get along with others. Def.'s SOF ¶ 37. McMillen viewed Comiskey's performance history going back to 2008 as reflecting that "teamwork was one of her biggest opportunity themes . . . throughout." McMillen Dep. 71:17-23 [#56-10]. McMillen was unaware of Comiskey's 2007 harassment complaint. Def.'s SOF ¶ 38.

On August 14, 2015, McMillen and Frontiero met with Comiskey. Id. ¶ 44. McMillen testified that, during this meeting, she found Comiskey's explanation for why Beaulieu caused her to fear for her life confusing. Id. ¶ 46. In particular, the incidents that Comiskey said caused her to fear for her life occurred after she reported to her coworkers that she was in fear for her life. Id. ¶ 47.

On August 17, 2015, McMillen interviewed Beaulieu and four or five other deli associates. Id. ¶ 48. These associates reported that Comiskey told people that "she has friends that are police officers and she is going to have them check out" Beaulieu and another associate, that she would "call the cops on them," that she "looks up legal stuff all the time to try to use against people," that she made up two separate sexual harassment claims against

coworkers, that one should not trust anything Comiskey says, that she is "delusional" and "a great actress," and that there is a lot of "hostility" regarding Comiskey. Id. ¶ 49; Exhibits to Baillie Dep. 31 [#56-7]. McMillen wrote that another associate stated Comiskey is "moody and you never know when she's going to have an emotional outburst." McMillen Dep. 114:14-16 [#56-10]. Frontiero interviewed another associate the next day, and that associate reported similar concerns regarding Comiskey. Def.'s SOF ¶ 50.

On August 19, 2015, Frontiero and Baillie received an email from West Peabody Assistant Store Manager Michael Khanoyan stating, "Norm [Dellacroce] from the Deli pulled me aside to speak to me today about a concern he has with Emily [Comiskey]." Exhibits to Frontiero Dep. 28 [#56-9]. According to the email, Dellacroce complained that Comiskey followed him everywhere he went while he was working, trying to talk to him. Id. Further, Dellacroce said he thought that Comiskey's behavior was "bordering harassment," but he was afraid to ask her for more space because she might become upset. Id.

McMillen and Frontiero met with Comiskey again on August 24, 2015. Def.'s SOF ¶ 51. McMillen asked Comiskey what made her fear for her life, and Comiskey replied that Beaulieu was mad and yelling. Id. ¶ 52. At the end of this meeting, Frontiero told Comiskey that he was placing her on suspension with pay while McMillen completed her investigation. Id. ¶ 56. Comiskey was told that she was being placed on suspension so that management could determine whether she was still a good fit for the store. Id. ¶ 57.

After McMillen completed her investigation, she discussed potential recommendations with others in human resources. McMillen Dep. 136:2-16 [#56-10]. She concluded that "the atmosphere in the deli department needed some change and we thought a good possibility would be to transfer [Comiskey] to a new location that was only a couple miles from [the West

Peabody] store." Id. McMillen asked Frontiero to see whether Comiskey was open to a transfer. Id. Comiskey was offered a position in a different department in the West Peabody store or, alternatively, a transfer to the deli department in the Saugus store. Frontiero Dep. 11:11-14 [#56-9]. Comiskey was not pleased with the options presented. Comiskey Dep. 85:2-9 [#56-1].

Comiskey remained on paid suspension from August 24, 2015, until September 6, 2015, when she was approved for FMLA leave. Def.'s SOF ¶¶ 58-59. Comiskey applied for social security disability benefits, and the Social Security Administration later determined that Comiskey had become fully disabled as of her last day working at Hannaford on August 24, 2015. Def.'s SOF ¶ 60; Exhibits to Comiskey Dep. 1 ("Social Security Decision") [#56-3]. Comiskey has remained medically unable to work since that date. Def.'s SOF ¶ 61.

In September 2016, Hannaford sold its West Peabody store to Big Y. Id. ¶ 62. As part of this process, all employees of the West Peabody store, including Comiskey, were separated from their employment with Hannaford. Id. ¶ 66. All employees at the West Peabody store were offered the opportunity to apply for continuing employment with Big Y. Id. ¶ 63. Employees who were not hired by Big Y despite submitting applications received severance packages. Id. Comiskey, who remained medically unable to work, did not apply for continued employment with Big Y. Id. Comiskey testified that it was too difficult for her to return to work. Each time management talked to her, suspended her, or disciplined her, she "looked at it as threatened, like you're going to lose your job." Comiskey Dep. 56:7-11 [#56-4]. Comiskey testified that she "was afraid to go back because it would have – it would have been over the top." Id. at 56:15-16.

II.     Procedural History

On May 5, 2016, Comiskey filed a complaint in state court. Hannaford timely removed

the action on July 1, 2016. See Notice of Removal [#1].

On June 20, 2016, Comiskey filed a Charge of Discrimination with the Massachusetts Commission Against Discrimination ("MCAD") and the Equal Employment Opportunity Commission ("EEOC"). Comiskey withdrew the complaint on October 19, 2016, in order to join her discrimination claims with this action.

Plaintiff's Second Amended Complaint was filed on October 19, 2016. Plaintiff alleges disability discrimination under M.G.L. ch. 151B (Count IV), perceived disability discrimination under M.G.L. ch. 151B (Count V), retaliation under M.G.L. ch. 151B (Count VI), disability discrimination under the Americans with Disabilities Act ("ADA") (Count VII), and retaliation under Title VII of the Civil Rights Act of 1964 (Count VIII).[2]

III.    Standard

Summary judgment is appropriate only where the party moving for summary judgment "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of fact exists if an issue can be resolved in favor of either party. Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004). A fact is material if it has the potential to affect the outcome of the case. Id. The court "must construe the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in the party's favor," but can "safely ignor[e] conclusory allegations, improbable inferences, and unsupported speculation." Collins v. Univ. of N.H., 664 F.3d 8, 14 (1st Cir. 2011) (citation omitted) (first alteration in original).

---

[2] The parties' joint Stipulation of Dismissal of Counts I, II and III [#47] disposed of Comiskey's claims for invasion of privacy (Count I), interference with Family and Medical Leave Act ("FMLA") rights (Count II), and retaliation under the FMLA (Count III).

IV.    Discussion

    a.    *Retaliation Claims*

Comiskey claims that she was retaliated against in violation of Title VII (Count VIII) and M.G.L. ch. 151B (Count VI) for her 2007 report of sexual harassment by Gaudette.[3] Where, as here, there is no direct evidence of the defendant's retaliatory animus, the McDonnell Douglas burden-shifting framework is used on summary judgment to allocate and order the burdens of producing evidence. See Mesnick v. General Elec. Co., 950 F.2d 816, 827 (1st Cir. 1991) (explaining the interplay between the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and the standards for summary judgment). Comiskey must first establish a *prima facie* case of retaliation by showing that "(i) she undertook protected conduct, (ii) she suffered an adverse employment action, and (iii) the two were causally linked." Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). For purposes of this motion, Hannaford does not dispute that Comiskey's 2007 report qualifies as protected conduct or that Hannaford's August 2015 placement of Comiskey on paid leave qualifies as an adverse action. It disputes, however, that there is any causal connection between these events.

The dispute between Hannaford and Comiskey on this point centers around who made the decision to place Comiskey on paid leave. As Hannaford highlights, Frontiero – whom Hannaford characterizes as the decisionmaker – had never heard of Gaudette or Comiskey's report of sexual harassment. Comiskey does not dispute that Frontiero was unaware of the 2007

---

[3] Comiskey also appears to assert that she was retaliated against for reporting Glynn's 2013 conduct in grabbing Comiskey's face. See Pl.'s SOF Responses ¶ 67. Yet Comiskey has not shown how this was sexual harassment or harassment based on any other protected class or status, and thus has not shown it to be protected conduct under Title VII or M.G.L. ch. 151B.

sexual harassment complaint, but disputes that he was the lone decisionmaker in placing Comiskey on leave. She contends that both McMillen and Baillie also took part in the decision.

Comiskey *has* presented evidence showing that McMillen was a decisionmaker, as she conducted the investigation of the I-Share complaint, interviewed co-workers, concluded that the attitude of the deli department in the West Peabody store needed to change, and recommended that Comiskey be removed from the West Peabody deli department. However, Comiskey has not shown that McMillen was aware of the 2007 sexual harassment complaint or that animus based on the complaint influenced McMillen's decisionmaking in any way.

As to Baillie's role, Comiskey has not produced evidence showing Baillie was a decisionmaker. Comiskey argues Baillie tainted the decisionmaking process by not telling McMillen about Comiskey's 2007 harassment complaint. However, Baillie's role in keeping information regarding protected conduct out of McMillen's investigation prevented retaliatory animus from playing a role in McMillen's investigation and decisionmaking, rather than injecting such animus into the process. At most, Comiskey may be able to show Baillie influenced the decisionmaking by telling McMillen that Comiskey did not tell the truth and did not get along with her co-workers. But still, there is no evidence indicating that Baillie's decision to make negative comments about Comiskey to McMillen in the course of the 2015 investigation was retaliation for Comiskey's protected activity eight years prior, or that Baillie's comments improperly influenced McMillen's investigation into the I-Share complaint.

In short, Comiskey's failure to produce any evidence of causation between her protected conduct and adverse action dooms her retaliation claims. Absent this evidence, the eight-year separation between these two events negates any causal inference.

Comiskey's retaliation arguments do not end here. She also argues Hannaford retaliated

against her for filing the 2007 sexual harassment complaint by subjecting her to a hostile work environment. Comiskey alleges that after she lodged the January 2007 sexual harassment complaint against Gaudette, which led to Gaudette's termination, she was "red flagged" and experienced a hostile work environment from both co-workers and management that led ultimately to her placement on paid leave in August 2015. Comiskey alleges that she was ostracized by her co-workers in the deli department and that she could not find help from Hannaford management. Hannaford argues that this cannot support Comiskey's claim for retaliation under Title VII or M.G.L. ch. 151B because (1) these events are time-barred, and (2) the events do not rise to the level of a hostile work environment.

"[W]orkplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for Title VII retaliation cases." Noviello, 398 F.3d at 89. This is the case under Massachusetts law as well. Id. at 90. To give rise to a hostile work environment claim, "[t]he harassment must be 'objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.'" Id. at 92 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998)). "[R]udeness or ostracism, standing alone, usually is not enough to support a hostile work environment claim." Id. The harassment "must stem from an impermissible motivation" – here, Comiskey's filing of a sexual harassment complaint. Maldonado- Cátala v. Mun. of Naranjito, 876 F.3d 1, 11 (1st Cir. 2017).

Even assuming the treatment Comiskey received from her co-workers rose to the level of a hostile work environment, Comiskey's hostile work environment claims are time-barred. Comiskey's statute of limitations for filing her complaint was "300 days after the alleged act of discrimination." M.G.L. ch. 151B § 5; see also 42 U.S.C. § 2000e-5(e)(1) (Title VII statute of

limitations extended from 180 days to 300 days when aggrieved person has instituted proceedings with state antidiscrimination agency). Comiskey filed her discrimination charge with MCAD on June 20, 2016. For Comiskey to be able to bring an action based on her co-workers' conduct toward her *prior to* 300 days before her filing of the charge – that is, before August 25, 2015 – Comiskey must show that the running of the statute of limitations was tolled. She attempts to do this by relying on the "continuing violation" doctrine, which provides that "a plaintiff may obtain recovery for discriminatory acts that otherwise would be time-barred so long as a related act fell within the limitations period." Tobin v. Liberty Mut. Ins. Co., 553 F.3d 121, 130 (1st Cir. 2009). Comiskey contends that her placement on administrative leave was a discriminatory act related to the hostile work environment, and because this act occurred within the limitations period, the hostile work environment claims are not time-barred.

Comiskey's continuing violation argument fails, however, because Hannaford's placement of Comiskey on leave itself involved no objectively or subjectively offensive harassment. To serve as a hook for a continuing violation claim, a hostile act occurring within the limitations period must be "part of the same unlawful employment practice" as those acts outside the filing period on which a plaintiff seeks to recover. See Franchina v. City of Providence, 881 F.3d 32, 47 (1st Cir. 2018) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 114 (2002)). Because Comiskey has offered no evidence suggesting that her placement on administrative leave constituted harassment, and because all other conduct at issue in the case occurred more than 300 days before Comiskey filed her MCAD discrimination charge, Comiskey's hostile work environment claims are untimely. See Russell v. Enterprise Rent-A-Car Co. of R.I., 160 F. Supp. 2d 239, 262 (D.R.I. 2001) (citing Smith v. Ashland, 250 F.3d 1167, 1173 (8th Cir. 2001)) (termination within limitations period does not anchor

harassment claims based on prior conduct occurring outside the limitations period).

Accordingly, Hannaford is entitled to summary judgment on Comiskey's retaliation claims under both Title VII and M.G.L. ch. 151B.

### b. *Disability and Perceived Disability Discrimination Claims*

Comiskey brings three separate disability discrimination claims – disability discrimination under the ADA (Count VII), disability discrimination under M.G.L. ch. 151B (Count IV), and perceived disability discrimination under M.G.L. ch. 151B (Count V). "The ADA prohibits an employer from discriminating against an otherwise qualified individual based on a real or perceived disability." Murray v. Warren Pumps, LLC, 821 F.3d 77, 83 (1st Cir. 2016). Massachusetts law similarly prohibits employers from discriminating on the basis of handicap or perceived handicap. Id. As to the issues presented in this case, Comiskey's state and federal disability and perceived disability discrimination claims are governed by the same legal framework. See Tobin, 553 F.3d at 125 n.3.

One issue to resolve at the outset is what constitutes Comiskey's disability or perceived disability. Hannaford does not challenge, for purposes of summary judgment, that Comiskey is a qualified individual with a disability and a handicapped person under the ADA and Massachusetts law. See Def.'s Mem. in Support of Summ. J. 8 [#55]. Hannaford considers Comiskey's disability to be limited to PTSD and the panic attacks suffered as a result of her PTSD. While the complaint does not specifically allege Comiskey's disability, it refers to Comiskey's panic attacks, and Comiskey referenced both the panic attacks and PTSD during her deposition. Comiskey contends, however that her disability also includes a general inability to interact with other co-workers. See Pl.'s Opp'n to Def.'s Mot. Summ. J. 2 [#71]. Hannaford argues that Comiskey is attempting to broaden the disability alleged in a last-ditched effort to

avoid summary judgment. Hannaford further argues that had it known Comiskey would attempt to expand the disability on which she bases her disability discrimination claims, it would not have conceded that Comiskey qualifies as a disabled individual, because interacting with co-workers and customers is an essential function of the deli associate job, and because the record evidence does not demonstrate that Comiskey's social difficulties rise to the level of a disability. According to Hannaford, if Comiskey wished to build a case based on a social interaction condition, she should have amended her complaint. Def.'s Reply to Pl.'s Opp'n to Mot. Summ. J. 1-2 [#74].

Hannaford is correct that Comiskey's complaint nowhere alleges that she has a disability in the form of an inability to interact with co-workers or the public. What she alleges is a disability that includes PTSD, anxiety, and panic attacks. Even assuming, however, that the record supported Comiskey's claim that she also suffers from a social interaction condition, Comiskey has produced no authority to support her position that such a condition rises to the level of a disability within the meaning of the ADA. Nor has Comiskey produced any authority supporting her position under Massachusetts law. Accordingly, the court construes Comiskey's claimed disability to consist of panic attacks and PTSD.

Comiskey contends that she has presented direct evidence of disability discrimination. Comiskey argues that the statements by Frontiero and McMillen that the atmosphere in the deli needed to change and that Comiskey's co-workers in the deli department did not like her are direct evidence of discrimination. In support, she presents evidence that her co-workers referred to her crying episodes and panic attacks as "drama," that Beaulieu called these attacks "bullshit" and said Comiskey had an "unstable personality," and that McMillen thought Comiskey was "out of touch with reality," as direct evidence of discrimination because these comments are

based on factors "other than individual merit." Id. But the ADA and Massachusetts law prohibit discrimination based on the individual's *disability*. They do not give employees protection against all adverse actions based on factors other than individual merit. The statements Comiskey references – none of which explicitly refer to her disability – are not direct evidence of prohibited disability discrimination. See Patten v. Wal-Mart Stores East, Inc., 300 F.3d 21, 25 (1st Cir. 2002) (statements that may be interpreted in different ways are not direct evidence of discrimination).

Despite the absence of direct evidence, Comiskey could still prevail on her discrimination claims if she could satisfy the McDonnell Douglas burden-shifting analysis. See Tobin, 433 F.3d at 104 (applying burden-shifting test to disability discrimination claims). To prevail under this analysis, Comiskey first must make out a *prima facie* case of discrimination. Because Hannaford does not challenge for summary judgment purposes that Comiskey is a disabled person or that she was subjected to an adverse employment action when Hannaford placed her on a paid leave of absence in August 2015, the only element of the *prima facie* case at issue is whether Hannaford's adverse action was "because of, in whole or in part, [Comiskey's] protected disability." Id.

This step requires Comiskey to show some nexus between her disability and the adverse action taken against her. Even Comiskey's own characterizations of why her relationships with her colleagues in the deli department devolved into an antagonistic atmosphere seem to point to factors other than prohibited disability discrimination. For example, Comiskey contends that she was a stellar employee who always went above and beyond. When asked why she believes her co-workers did not like her, Comiskey explained:

> Because of what [a member of Hannaford's board of directors] said
> to me. You are so into the customers. You are into the food products.

> You know everything. You have a wonderful personality. From
> watching you, you are great with customers. And I think that's why.
> I think – not to pat myself on the back but I liked what I did and I
> don't think they liked what they do. I think it was just a job for them
> to have. They would come in every day and it was like, I hate this, I
> hate that. They were just miserable and I think because I was happy
> and a nerd in my job, they just bullied me.

Comiskey Dep. 59:5-15 [#56-1]. Comiskey further testified that her co-workers in the deli

department did not like her "because [she is] a nerd," <u>id.</u> at 87:5, and because her co-workers

did not like their jobs even though she liked her job, <u>id.</u> at 87:10-20.

Nonetheless, Comiskey argues that her co-workers did not like her because of her

disability. In particular, Comiskey argues that Beaulieu submitted the 2015 I-Share complaint,

which specifically references Comiskey's "unstable personality," because Beaulieu harbored

animus against Comiskey based on her disability. Further, Comiskey highlights that her co-

workers complained about her "drama," "emotional outbursts," and frequent crying, and called

her "delusional," "cranky," and even "Hitler's wife." According to Comiskey, this led McMillen

to conclude that Comiskey has an incorrect perception of facts and reality. Comiskey argues that

these statements by her co-workers reflect their hostility to Comiskey's disability and thus

demonstrate the requisite causality between her disability and placement on leave. However,

none of these statements refer to Comiskey's disability of PTSD and panic attacks.

Even assuming Comiskey is correct that some of her co-workers demonstrated animus

based on her disability, and that some of their negative statements about her were motivated by

such discriminatory animus, this animus is not attributed to the decisionmakers behind the

adverse action at issue.[4] Evidence of discriminatory animus on the part of other co-workers

---

[4] As described *supra*, Hannaford contends Frontiero is the lone decisionmaker, while Comiskey
contends Baillie and McMillen were also decisionmakers. For purposes of summary judgment,
the court views Frontiero and McMillen, but not Baillie, as decisionmakers.

who were not decisionmakers and did not take any adverse employment action against Comiskey is not material. <u>See</u> <u>Bennett v. Saint-Gobain Corp.</u>, 507 F.3d 23, 29 (1st Cir. 2007) (comments by non-decisionmaker that did not affect outcome of adverse action were nothing more than stray remarks insufficient to defeat summary judgment).

Aside from demonstrating supervisory animus based on her disability, Comiskey could only prevail on her disability discrimination claim based on a "cat's paw" theory, which she has neither alleged in her complaint nor argued in her papers. Even assuming Comiskey had advanced such a theory, however, it would fail. Under the cat's paw theory of liability, "if a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." <u>Staub v. Proctor Hosp.</u>, 562 U.S. 411, 422 (2011). In line with this theory, Comiskey argues that Baillie was motivated by animus, based on Comiskey's disability, which caused Baillie to make negative comments about Comiskey to McMillen. In turn, according to Comiskey, these negative comments influenced McMillen's investigation and ultimate recommendation that Comiskey needed to be removed from the deli department in the West Peabody store. Yet Comiskey does not produce any evidence to support a jury finding of proximate causation between Baillie's comments and McMillen's recommendation. Indeed, McMillen decided to investigate Beaulieu's I-Share complaint at the regional level to avoid tainting the decisionmaking process with the negative atmosphere surrounding Comiskey at the West Peabody store.

Although Comiskey asserts that the decision to place her on administrative leave was motivated "almost exclusively" by hostility toward her disability, she fails to cite any evidence in the record showing a causal connection. To the contrary, the record reflects that although

Comiskey did not inform Hannaford that she had a disability, Hannaford took numerous steps to accommodate Comiskey during her panic attacks, including allowing her to take additional paid breaks in the back room to collect herself. This occurred over a period of years, and during numerous supervisors' tenures at the West Peabody store. Over the years, Hannaford repeatedly attempted to improve the atmosphere in the deli through means other than removing Comiskey – including by holding meetings between co-workers over disagreements, engaging in professional counseling, and instructing Comiskey as to what the Hannaford anti-harassment policies required of her.

Accordingly, Hannaford is entitled to summary judgment on Comiskey's claims for disability discrimination under the ADA, disability discrimination under M.G.L. ch. 151B, and perceived disability discrimination under M.G.L. ch. 151B.

V.      Conclusion

For the foregoing reasons, Hannaford's Motion for Summary Judgment [#55] is ALLOWED. Judgment as a matter of law is entered in favor of Hannaford as to Counts IV, V, VI, VII, and VIII of Comiskey's Amended Complaint [#30].

        IT IS SO ORDERED.

June 28, 2018                                          /s/ Indira Talwani
                                                       United States District Judge